IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| FRANK G. FOELL,<br><br>                Plaintiff,<br><br>      vs.<br><br>COUNTY OF LINCOLN, a Nebraska<br>Political Subdivision; PAMELA HICKS,<br>in her individual and official capacities;<br>JEROME KRAMER, in his individual<br>and official capacities; and  JOHN<br>DOES 1-10,<br><br>              Defendants. | **4:17CV3044**<br><br><br>**MEMORANDUM AND ORDER** |

Plaintiff Frank Foell has filed a civil rights action under 42 U.S.C. § 1983 against the County of Lincoln, Nebraska ("Lincoln County") and against Lincoln County Detention Center ("LCDC") nurse, Pamela Hicks; Lincoln County Sheriff, Jerome Kramer; and John Does 1-10, each in their individual and official capacities. Foell alleges Defendants were deliberately indifferent to his serious medical needs while he was incarcerated at LCDC. He also alleges pendant state law claims for negligence under the Political Subdivision Tort Claims Act. Neb. Rev. Stat. § § 13-901 et seq.

Defendants now move for summary judgment as to all claims and Defendants based upon qualified immunity, the discretionary function exemption of the Political Subdivision Tort Claims Act, lack of proximate causation, and lack of any genuine issue as to any material fact. For the reasons stated below, Defendants' motion will be granted in full as to John Does 1-10, granted in part and denied in part as to Defendants Kramer and the County of Lincoln, and denied in full as to Defendant Hicks.

MOTIONS TO STRIKE

A.    Standard of Review

Before the court evaluates the facts and legal issues raised on Defendants' motion for summary judgment, it must address the parties' respective objections to the proffered evidence. On summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Advisory Committee Notes to 2010 Amendment, Subdivision(c)(2). "[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could* be presented at trial in an admissible form." Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 793 (8th Cir. 2012).

B.    Plaintiff's Motion to Strike Defendants' Expert Affidavits

Plaintiff claims Defendants failed to disclose their expert reports in accordance with the court-ordered case progression schedule. He therefore moves this court to strike exhibits 4, 11, and 12 from Defendants' Index of Evidence, and he moves that these exhibits not be considered on Summary Judgment. (Filing No. 71). Specifically, Plaintiff argues that Defendants: (1) did not timely identify Barbara Eshleman, R.N. ("Eshleman") as an expert; and (2) failed to timely provide expert witness reports from all three experts—Eduardo Freitas, M.D. ("Freitas"), Daniel Evans ("Evans"), and Eshleman—as required by Fed. R. Civ. P. 26(a)(2)(B). Plaintiff asserts that to now permit Defendants to rely upon

these previously undisclosed expert opinions will unduly prejudice the plaintiff. (Filing No. 71, at CM/ECF pp. 3–4).

Defendants dispute Plaintiff's interpretation of the expert progression deadline, arguing that both their identification of experts and their disclosure of the three reports were timely. (Filing No. 82, at CM/ECF p. 2). Defendants argue that the court did not set new expert deadlines after the stay imposed for the settlement conference was lifted. (Id.) Therefore, Defendants argue that in the absence of a stipulation by the parties or a court order, expert disclosures must be made "at least 90 days before the date set for trial or for the case to be ready for trial." Fed.R.Civ.P 26(a)(2)(D)(i)).

Trial in this case is currently scheduled for August 26, 2019. Under Fed. R. Civ. P. 26(a)(2)(D), expert reports were therefore due by May 28, 2019. Defendants state that they did not have expert reports from Freitas, Eshleman, or Evans until March 28, 2019, and that these reports were provided to Plaintiff via email the next day, on March 29, 2019. (Filing No. 82, at CM/ECF p. 2). Therefore, Defendants argue that the identification of experts and disclosure of reports were done in a timely manner, two months ahead of the deadline. (Filing No. 82, at CM/ECF p. 2). Defendants further attest that Plaintiff was provided signed affidavits from each of the three experts two business days after Defendants received them. (Id.)

Plaintiff counters that the law still militates against a finding for Defendants, explaining:

> [T]here is a reasoned order in how a case progresses from the pleading to trial stage. Both parties are to be provided with the necessary discovery about the evidence and witnesses the other side is going to rely on for trial well in advance so the parties can do their

due diligence in a timely fashion to determine if there is a need for rebuttal witnesses, lay or expert.

. . .

The reason that the summary judgment and <u>Daubert</u> motion in limine deadlines come after the end of the discovery deadline is to allow both parties to do the necessary discovery so there are no unfair surprises when a summary judgment is filed or a <u>Daubert</u> challenge to an expert witness is made.

(Filing No. 86, at CM/ECF p. 2). In sum, Plaintiff argues that permitting Defendants to evade the progression schedule's mandate would undermine the operational objective of the rules themselves.

Plaintiff raises a valid point. Nevertheless, under the instant facts, Defendants' expert reports must be deemed timely under the plain language of Fed.R.Civ.P 26(a)(2)(D). Accordingly, because expert report deadlines were not included in the case progression order entered after the stay of progression, the 90-day rule applied. Plaintiff's motion to strike exhibits 4, 11, and 12 will be denied.

That said, it appears the parties' expert deadline dispute arose because of the court's mistake. Specifically, I overlooked setting new expert deadlines when I entered a post-stay progression order, and the defendants took advantage of that oversight. As such, and in the interest of justice, the court will grant Plaintiff additional time to depose Defendants' experts in preparation for trial, and to disclose experts if he chooses to do so.

C.     Plaintiff's Motion to Strike letter from Laura Kubitz

Plaintiff moves this court to Strike Exhibit 3 from Defendants' Index of Evidence in Support of Defendants' Reply Brief for Summary Judgment. (Filing No.

4

84). Exhibit 3 is a letter from Laura Kubitz, Administrative Assistant for the Nebraska Department of Health and Human Services, addressed to Defendant, Pamela Hicks (hereafter "Kubitz letter"). (Filing No. 81, at CM/ECF p. 8). The Kubitz letter informs Defendant Hicks that the Professional Board and the Attorney General have decided not to pursue an investigation into a complaint filed against Hicks. (Id.)

Plaintiff argues the letter is inadmissible hearsay without foundation, lacks relevance, and it should be stricken from evidence accordingly. (Filing No. 85, at CM/ECF p. 2). Defendant counters that the letter falls under the Public Records exception to hearsay and is relevant, arguing:

> The letter serves the purpose of demonstrating the lack of any evidence the Plaintiff has to support his claim that Nurse Hicks' actions fell below the standard of care under the Nebraska Standards. It also serves as a rebuttal for Nebraska Nursing Standards that the Plaintiff brought before this Court in the Plaintiff's Brief in Opposition to the Motion for Summary Judgment.

(Filing No. 89, at CM/ECF pp. 2–3).

Defendants have not shown the letter is admissible, or that it could be admissible at trial. The allegations of the complaint against Nurse Hicks are unknown. (See Filing No. 81, at CM/ECF p. 8). The same is true of the investigation details and the rationale underlying the decision not to pursue prosecution. (Id.). The information and criteria considered by the Professional Board and the Attorney General is statutorily confidential under Nebraska law and therefore shielded from subpoena or discovery. Neb. Rev. Stat. § 38-1,106. Further, Defendants' purported purpose of using the letter "as a rebuttal for Nebraska nursing standards" serves as an improper, undisclosed expert opinion without reference to a scintilla of supporting foundation. (See, Filing No. 89, at CM/ECF pp. 2–3). Therefore, the

Kubitz letter is not probative of any issue and cannot be used at trial. Moreover, to the extent Plaintiff's claims are based on Hicks' alleged violations of state nursing regulations, a letter purporting to conclude that an investigation of such claims is unnecessary addresses the ultimate issue to be decided, invades the province of a jury, and is more prejudicial than probative.

Plaintiff's motion to strike exhibit 3 will be granted.

MOTION FOR SUMMARY JUDGMENT

A.    Standard of Review

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the initial burden of articulating the basis for its motion and directing the court's attention to those portions of the record which prove the absence of a genuine issue of material fact. Id. at 323. Where Plaintiff bears the ultimate burden of proof on a dispositive issue at trial, this can be met by Defendants "pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." Id. at 325. After Defendant has met this burden, it is up to Plaintiff to set forth specific facts, beyond the pleadings, showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).

An issue is "genuine" if the evidence could lead a reasonable jury to return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc, 477 U.S. 242,

248 (1986). A fact is "material" if the dispute might affect the outcome of the case under governing law. Id. In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Dancy v. Hyster Co., 127 F.3d 649, 652-53 (8th Cir. 1997). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue; the court merely determines whether there is evidence creating a genuine issue for trial. Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999). See also, Anderson, 477 U.S. at 251-52 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.") (internal citations omitted). Where the party who bears the ultimate burden of proof presents sufficient probative evidence that would permit a favorable finding based on more than mere speculation, conjecture, or fantasy, summary judgment must be denied.

B.     Statement of Facts

Limited to the admissible evidence, and for the purposes of the pending motion, the following facts are either undisputed or considered undisputed when viewed in the light most favorable to Plaintiff.

Defendant Jerome Kramer is the Lincoln County Sheriff ("Sheriff Kramer"), having served in this capacity since August 2006. As commanding officer of Pamela Hicks, LPN ("Nurse Hicks"), and John Does 1-10, Sheriff Kramer was at all relevant times responsible for the training, supervision, and conduct of Defendants. In this capacity, Kramer also established and instituted policies and

procedures to ensure that the LCDC staff obeyed state and federal laws, and enforced the regulations of Lincoln County.

Nurse Hicks is a licensed practical nurse in the State of Nebraska, and at all relevant times served as the head detention center nurse for LCDC.

In June 2011, Sheriff Kramer approached the Lincoln County Board of Commissioners to discuss the county's current contract for LCDC medical services with Sandhills Health District ("Sandhills"). The county's contract with Sandhills for the current fiscal year was scheduled to lapse on June 25, 2011, at which point the proposed contract for the next fiscal year was to be raised to $145,973—an increase of $83,973 from the current contractual rate of $62,000. To avoid this cost increase, Sheriff Kramer proposed that the county instead hire a fulltime LPN to work for the county, noting that Drs. Walt and Deb Weaver had volunteered[1] to be doctors for the detention center. (Filing No. 74-2, at CM/ECF p. 111–12). Sheriff

---

[1] Deposition of Sheriff Kramer, October 24, 2018:

> Q. And when it indicates that they volunteered to be the doctors, what do you understand that to mean?
>
> A: I guess just that. They agreed to take on that role.
>
> Q: But they—not that they wouldn't be paid, correct?
>
> A: Right.
>
> Q: And what did you understand their role -- role would be if this plan was adopted?
>
> A: Well, they would be the direct contact for the jail nurse.
>
> Q: They would be the direct contact for the nurse? What does that mean?
>
> A: That would mean we have a nurse that's going to assess your daily needs in the jail, the assessments, and if she needed any advice, prescriptions, so on, that were above her daily assessment, she would refer to them.

(Filing No. 74-2, at CM/ECF p. 115.)

Kramer stated that he believed the county could make this program work for $62,228 for the next fiscal year. The plan was unanimously approved and the Sandhills contract was not renewed. (Filing No. 74-2, at CM/ECF p. 6).

As LCDC medical directors, the Weavers' primary role was to modify departmental protocols as needed, including implementing updates to LCDC's policy manual. (Filing No. 74-2, at CM/ECF p. 133–34). One main purpose of these revised protocols was to allow for the detention center's on-duty LPN to order and administer prescription medicine for identified conditions without contacting a doctor for further authorization. The Weavers' role of performing actual medical examinations for detainees or inmates at LCDC was "reserved . . . for extreme circumstances." (Filing No. 74-2, at CM/ECF pp. 135–36).

On November 15, 2015, Foell was arrested for DUI and resisting arrest by the North Platte police. Foell, who was heavily intoxicated and combative toward law enforcement, was taken to LCDC at approximately 10:20 p.m. (Filing No. 74-1 at CM/ECF p. 1). When he arrived at the LCDC, he was bleeding from the head, ankles, and foot, and he had wrist injuries, cellulitis on his left elbow, and a tooth infection, all of which were reported upon admission to the LCDC.

On November 16, 2015, upon his intake to the detention center, Plaintiff was running a fever of 101 degrees, and his blood pressure as measured by Nurse Hicks was reportedly high. Hicks restricted Plaintiff's salt intake.

Plaintiff remained segregated in confinement until November 19, 2015.[2] Plaintiff was provided acetaminophen on November 17, 18, 19, 20, and 21, 2015, two times per day and at night. (Filing No. 74-1, at CM/ECF p. 2).

On November 19, 2015, Defendant was moved to the "General Population" at LCDC. That same day, Plaintiff submitted a medical request via the kiosk—the sole way for inmates to communicate their medical needs to staff. Foell stated that his injured elbow had become infected and that he suspected he was running a fever. Nurse Hicks later came by Plaintiff's cell, speaking to Foell through a tray-opening on his cell door. (Filing No. 74-1, at CM/ECF p. 2). Based on this communication, Nurse Hicks put Defendant on antibiotic Cephalexin, a generic form of Keflex. (Filing No. 74-2, at CM/ECF pp. 48–58). Nurse Hicks also started Foell on diphenhydramine (Benadryl), which he was ultimately given every night through December 24, 2015 "to help [him] sleep." (Filing No. 74-1, at CM/ECF p. 3). Nurse Hicks did not take any of Foell's vitals, perform an examination of his elbow, or confer with a physician prior to starting Plaintiff on the Cephalexin prescription.

Later, when Foell renewed his complaint of a suspected abscessed tooth, Nurse Hicks informed him that per dental protocol, two antibiotics needed to be given before an inmate would be allowed to see a dentist. (Filing No. 72, at CM/ECF p. 7). Accordingly, on November 30, 2015, Foell sent the following written medical communication to Nurse Hicks through the Kiosk system:

> i still have an absest [sic] front tooth and need another round of antibiotics thank u frank foell

_____

[2] The parties dispute why Plaintiff was kept in a holding cell through November 19, 2015. Although Plaintiff admits he was initially placed in the holding cell for threatening staff, Plaintiff alleges his confinement there was prolonged because he was running a fever.

([Filing No. 74-1, at CM/ECF p. 13](#)). Nurse Hicks responded the next day, "I will get this ordered tomorrow and you will start tomorrow night or the next am." Foell was never seen by a dentist while incarcerated at LCDC.

On December 1, 2015, Plaintiff sent another communication through the kiosk, notifying Nurse Hicks that he was now experiencing excruciating back pain:

> im [sic] having issues with my back, i [sic] have had problems with it in the past also do [sic] to car wrecks my back hurts so bad now i can hardly breath cant [sic] sleep and hurts bad to sit at table for chow could u [sic] please give something for the pain or even some muscle relaxers to get it unlock i [sic] seriously can't take the pain much longier [sic] thanks for any help in this matter frank foell.

([Filing No. 74-1, at CM/ECF p. 14](#)). Foell further complained that he was constipated, having not had a bowel movement in days. Nurse Hicks responded by giving Foell Ibuprofen. Hicks did not further investigate or address Plaintiff's medical complaints but documented this response as "evaluated and treatment plan in place." ([Filing No. 74-1, at CM/ECF p.14](#)).

Early the next morning, on December 2, 2015, Foell again communicated to the nurse that he was "in serious pain", and it was all he could "do to get out of bed" and was "having difficulty" getting up for count. ([Filing No. 74-1, at CM/ECF p. 15](#)). He again requested that he be allowed to see a physician for the "cruel and unusual" pain he was being made to suffer. (Id.)

Nurse Hicks responded to Plaintiff's complaints by speaking with him through the tray opening in his cell door. Based on this visit, Nurse Hicks continued

providing ibuprofen and Benadryl, and further provided Cleocin, docusate sodium,[3] and milk of magnesia. She did not perform any physical examination of plaintiff, take his pulse, temperature, or blood pressure, or refer him for evaluation by a physician. But she again documented that Foell's medical complaint was "evaluated and treatment plan made". (Filing No. 74-1, at CM/ECF 14).

On December 3, 2015, at 8:25 a.m., Plaintiff submitted another written communication, begging Nurse Hicks to address his "severe pain", stating that he was about to lose his mind, that he hadn't slept in 5 nights and that he was keeping his cellmate up with his moans of pain. (Filing No. 74-1, at CM/ECF p. 17). Plaintiff further stated that he still hadn't had a bowel movement and felt that he was about to have a hernia from the pressure. (Id.) At this point, Nurse Hicks responded to Plaintiff, "I am changing the pain medications for a week to Tramadol", a Class IV Controlled Substance. Once again, she performed no physical examination of Plaintiff, nor did she assess any of his vitals, refer him for evaluation by a physician, or indicate that she conferred with Dr. Deb Weaver. (Filing No. 74-1, at CM/ECF p. 5).

Later that day, Defendant was sentenced to 90 days in jail after he pleaded guilty to driving under the influence. His custodial status was therefore changed from "detainee" to "inmate."

On December 5, 2015, Plaintiff submitted another communication via the kiosk to Nurse Hicks, requesting that he be put on the dental list to have his tooth pulled. On December 7, 2015, Nurse Hicks again replied that Plaintiff needed to

---

[3] Both Cleocin and docusate sodium require a physician's prescription under Nebraska state law.

be on two rounds of antibiotics before he could be scheduled to see the dentist. ([Filing No. 74-1, at CM/ECF p. 18](#)).[4]

At 4:08 p.m. on December 7, 2015, Plaintiff submitted another communication via the kiosk to Nurse Hicks, stating that he was "in so much pain" it was "almost more than [he could] take." ([Filing No. 74-2, at CM/ECF p. 104](#)). Plaintiff further relayed that he hadn't slept in days, and he requested an increase in his Unisom dosage. By this point, Plaintiff had been taking 50 mg of Tramadol twice a day since December 4, 2015, and Milk of Magnesia and Docusate Sodium since December 2, 2015. Later that day, Plaintiff submitted another communication via the kiosk:

> Please we have to do something about my back, I can't eat [sic] I can't sleep [sic] I can't sit Im [sic]ready to pass out on my feet [sic] I can't even go to the bathroom right [sic] I have never had anything hurt this bad for this long [sic] pain scale of 1 to 10 would be a 10 please help

([Filing No. 74-2, at CM/ECF p. 105](#)).

At this juncture, Nurse Hicks removed Plaintiff from his cell and took him to a private room to examine his back. Once there she identified and palpated a lump around the area of Foell's midback and attempted to "massage it away." Foell reacted to this with a great deal of pain. ([Filing No. 74-1, at CM/ECF p. 7](#)). Nurse Hicks returned Plaintiff to his cell and did nothing further to address the palpated but undiagnosed lump or the worsening back pain.

On December 10, 2015, Defendant started work release at the Super 8 Motel where he worked prior to his arrest. Plaintiff recounts that the work was

---

[4] The record indicates that by December 7, 2015, Plaintiff had already been put on two rounds of antibiotics (cephalexin and clindamycin).

physically difficult for him due to pain. However, his supervisor permitted him to limit his tasks to only those he was able to perform. (Filing No. 74-1, at CM/ECF pp. 6-7).

On December 13, 2015, Plaintiff received his last dose of his antibiotics. (Filing No. 74-2, at CM/ECF p. 74). The next day, Nurse Hicks advised Plaintiff that she had scheduled a dental appointment for him—after his January 7, 2016 LCDC discharge date. (Filing No. 74-1, at CM/ECF p. 7).

By December 18, 2015, Foell was "begging the Detention Center Staff to take [him] to the doctor or the Emergency Room because of [his] pain." (Filing No. 74-1, at CM/ECF p. 8). Plaintiff was so desperate he even asked an LCDC staff member what would happen if he went to the Emergency Room while on work release. The staff member advised him that he would be charged with escape. (Filing No. 74-1, at CM/ECF p. 7). On this same day, Nurse Hicks put Plaintiff on four Ibuprofen, 200 mg twice daily, and withdrew the Tramadol prescription.

On December 20, 2015, Plaintiff was scheduled for 6-7 hours of work release. However, after working just an hour, he had to return to LCDC due to severe back pain. For the remainder of the day, Foell struggled to get up from his bunk for count or to eat. At 7:00 p.m. that evening, Foell sent another communication to Nurse Hicks via the kiosk to state that the medication was not working, pleading that, "nobody should have [sic] hurt this bad for this long?" (Filing No. 74-1, at CM/ECF p. 21). Nurse Hicks provided no response to Foell that day.

The next day, Nurse Hicks documented her kiosk reply: "We spoke about this today at am med pass…we will get the pain under control." (Id.) Once again,

she did not physically examine Plaintiff, take any of his vitals, mention any need to see a physician, or indicate that she conferred with Dr. Deb Weaver about how to properly get Plaintiff's pain under control. Following another conversation through the cell door's tray opening, Nurse Hicks put Plaintiff back on 50 mg Tramadol twice daily and docusate sodium. (Filing No. 74-2, at CM/ECF pp. 80-81).

By December 20, 2015, Plaintiff was no longer physically able to get out of bed and walk to the kiosk to convey additional medical complaints. Meanwhile, his back pain continued to progress in severity despite the increased dosages of Tramadol and Ibuprofen administered by Nurse Hicks. (Filing No. 74-1, at CM/ECF p. 8). On December 23, 2015, Plaintiff advised the medication aide that he was experiencing uncontrollable back spasms. (Id. at CM/ECF p. 9). He was not allowed to see a physician.

The next day, on December 24, 2015, Foell "woke up in excruciating pain and . . . had difficulty breathing." (Filing No. 74-1, at CM/ECF p. 9). Observing these symptoms, Nurse Hicks prescribed Flexeril and docusate sodium. Foell was not referred for examination by a physician.

But later that day, LCDC staff advised Plaintiff he would be permitted to see Dr. Deb Weaver—provided he arranged for his own transportation. (Filing No. 74-1, at CM/ECF p. 9). Plaintiff was in such pain by this point that he needed help calling his longtime partner to arrange for a ride. He could not button his clothes or bend over to tie his shoes. Once out the detention center's door, he required assistance to make it to the waiting vehicle. (Filing No. 74-1, at CM/ECF p. 9).

When Plaintiff arrived at Dr. Deb Weaver's office he was seen by Kelly Lewandowski, APRN. (Filing No. 74-1, at CM/ECF p. 10). This was the first and

only time Plaintiff was permitted to see a medical professional other than an LPN during his detention and subsequent incarceration at LCDC. Lewandowski promptly referred Plaintiff to the Emergency Room.

At the Great Plains Regional Center Emergency Room, Plaintiff was advised that he was septic and there was a chance he would not survive. ([Filing No. 72, at CM/ECF p. 12](#)). An MRI established that Plaintiff had developed a large phlegmon (8 by 6 by 5 centimeters) on his thoracic spine and discitis at the T8-9 level. Foell was advised that because he may need surgery, he would require emergency transportation to Kearney Good Samaritan Medical Center where a neurosurgeon would perform the surgery. ([Filing No. 74-1, at CM/ECF p. 10](#)).

While Plaintiff was still in the Emergency Room, Cecilia Childers from the LCDC staff rushed into the facility with a Medical Discharge form for Plaintiff to sign. (Id.) The result of this discharge was to excuse the detention center of financial liability with respect to Plaintiff's subsequently incurred medical bills.

Plaintiff was then transported by ambulance to Kearney Good Samaritan Medical Center. There, it was determined that Plaintiff was suffering from an infection which had caused his C reactive protein to skyrocket to around 120 and his sedimentation rate to rise to 99 or close to 100. ([Filing No. 74-2, at CM/ECF p. 169](#)). Blood cultures from Plaintiff's labs revealed that the infection was caused by Staphylococcus Aureus, a bacteria which that had been "brewing" on his spine for several weeks by the time he got to the emergency room. ([Filing No. 72, at CM/ECF p. 12](#)).

Dr. Jeffrey Sartin, M.D. initially recommended the phlegmon be drained through interventional radiology percutaneously or surgically. ([Filing No. 74-2, at](#)

CM/ECF pp. 177–78). Ultimately, an alternative treatment course was undertaken, whereby Plaintiff was administered intravenous antibiotics and heavy pain killers. At one point during his hospitalization, Plaintiff was advised that his kidneys were failing due to the heavy antibiotics he now required. (Filing No. 72, at CM/ECF p. 13). Plaintiff remained at Kearney Good Samaritan Hospital from December 24, 2015, through January 18, 2015. He was then transferred to "stepdown facility" ICU, where he stayed until February 21, 2016. (Filing No. 74-1, at CM/ECF p. 11).

Upon his discharge, Plaintiff was advised that although the infection on his thoracic spine had shrunken, it had resulted in a change to the disc height in this region. (Id.) Ultimately, Plaintiff was given a prescription for painkillers and directed to follow-up with epidemiologist, Dr. Freitas. (Id.) Plaintiff initially followed up with Dr. Freitas as directed but was financially unable to continue with the recommended visits. (Id.)

After his discharge, Plaintiff's capacity for physical work was diminished due to the level of pain he continued to experience in his mid-back. (Filing No. 74-1, at CM/ECF p. 11). Unable to physically keep up with his job at Dairy Queen, Plaintiff has been homeless since the summer of 2017. (Id.) Plaintiff continues to experience midback pain but is unable to afford medical care. (Id.)

On May 17, 2016, Plaintiff sent a Political Subdivision Tort Claim to the Lincoln County Clerk. (Filing No. 1, at CM/ECF p. 2). On June 1, 2016, the Lincoln County Commissioners voted to take no action and referred the Political Subdivision Tort Claim to its insurer. (Id.) On March 23, 2017, counsel for the Plaintiff withdrew the Claim so that the matter could be filed in federal court. (Id.)

C.      Analysis

This action is brought pursuant to the provisions of 42 U.S.C. § 1983 and Neb. Rev. Stat. §13-901–13-927. This court has jurisdiction pursuant to 28 U.S.C. § 1331, which grants original jurisdiction to federal district courts over questions of federal law, and 28 U.S.C. § 1367(a), which grants supplemental jurisdiction over claims so related to the original jurisdiction claims as to form part of the same case or controversy.

i.      42 U.S.C.§ 1983: Eighth Amendment Deliberate Indifference to Medical Needs Claims.

By enacting 42 U.S.C. § 1983, Congress ensured that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

An employee or official need not have complied with state law to be considered as acting under the color of state law. Under § 1983, liability exists where the action was taken within the scope of the defendant's official authority, even where the individual abused that authority. West v. Atkins, 487 U.S. 42, 49–50 (1988).

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." McRaven v. Sanders, 577 F.3d 974, 979 (8th Cir. 2009) (quoting Estelle v. Gamble, 429 U.S. 97, 104, (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by

18

prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle, 429 at 104–05 (footnotes omitted). "An official who is deliberately indifferent to a prisoner's medical needs is subject to suit under § 1983." McRaven, 577 U.S. at 979.

A claim of deliberate indifference to medical needs requires proof of two components: (1) an objectively serious medical need ("objective component"); and (2) that prison officials knew of the need but deliberately or recklessly disregarded it ("subjective component"). Langdon v. Norris, 614 F.3d 445, 459–60 (8th Cir. 2010) (citing Crow v. Montgomery, 403 F.3d 598, 602 (8th Cir. 2005)).

The objective component requires that the alleged deprivation be adequately serious to constitute an Eighth Amendment violation. Prisoners do not enjoy a guarantee of unfettered access to health care. Hudson v. McMillian, 503 U.S. 1, 9 (1992). "The objective component of an Eighth Amendment claim is therefore contextual and responsive to 'contemporary standards of decency' . . . only those deprivations denying the 'minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." Id. (internal marks omitted). "[W]hen the inmate alleges that the delay in treatment is the constitutional deprivation, the objective seriousness of the deprivation should also be measured by reference to the *effect* of delay in treatment." Crowley v. Hedgepeth, 109 F.3d 500, 502 (1997) (quoting Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995) (quoting Hill v. Dekalb Regional Youth Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994) (emphasis in Hill) ("An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.") (footnote omitted). Medical evidence indicating that a delay in treatment resulted in an adverse effect raises a genuine

issue of fact and supports denial of a summary judgment motion. (See, Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005).

The subjective component looks to Defendant's actual knowledge; whether the prison official(s) acted with deliberate indifference or recklessly ignored the prisoner's medical need. Langdon, 614 F.3d at 460 ("The plaintiff 'must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'") (quoting Alberson v. Norris, 458 F.3d 762, 765 (8th Cir.2006) (quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir.1995)). However, demonstration of a total deprivation of care is not required either; "[g]rossly incompetent or inadequate care can [also] constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment." Langdon, 614 F.3d at 460 (quoting Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir.1990) (citations omitted)).

Defendants herein allege a qualified immunity defense, arguing that their conduct or lack thereof did not, as a matter of law, violate the foregoing constitutional standards. In determining whether Defendants are entitled to qualified immunity as a matter of law, the court must determine "(1) whether the facts alleged or shown, construed in the light most favorable to [the plaintiffs], establish a violation of a constitutional right, and (2) whether that constitutional right was clearly established as of [the time of the relevant conduct], such that a reasonable official would have known that his actions were unlawful." Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009)(citing Pearson v. Callahan, 555 U.S. 223, 232 (2009).

The parties do not dispute that a prison official who is deliberately indifferent to the medical needs of a prisoner violates the prisoner's Eighth Amendment rights. Thus, it is uncontested the constitutional right was clearly established at all relevant times herein. Rather, Defendants challenge whether their actions, as supported by the evidence and reasonable inferences drawn therefrom and taken in the light most favorable to Plaintiff, establish deliberate indifference.

The court must therefore apply the two-part deliberate indifference to medical needs standard to determine whether, as to each defendant, Plaintiff's claims are barred by the defense of qualified immunity.

a.   Nurse Hicks

"Whether a prison's medical staff deliberately disregarded the needs of an inmate is a factually-intensive inquiry." Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1118 (8th Cir.2007). "The plaintiff-inmate must clear a substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded the inmate's needs by administering an inadequate treatment." Id. "Grossly incompetent or inadequate care can constitute deliberate indifference." Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990).

As to Nurse Hicks, Foell has placed evidence in the record—a declaration, an affidavit, deposition testimony of examining doctor Jeffrey Sartin, M.D.,[5] and

---

[5]     **Q.** And are you able to ascertain with any reasonable degree of medical certainty the cause of the infection in this case or the cause of the phlegmon?
**A.** Well, the cause was the Staphylococcus aureus germ that was isolated, yes.
**Q.** Okay. And you know that because the lab report found a particular germ. Is that the basis for your opinion, Doctor?

medical kite records—which, taken as true, satisfies the objective component of the analysis. See, Coleman v. Rahija, 114 F.3d 778 (8th Cir. 1997) ("A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" (quoting Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995). Foell suffered from a staph infection that increased in severity over several weeks, resulting in increasing back pain, the appearance of an unidentified mass on his thoracic spine, and in later weeks, his difficulty breathing, eating, sleeping, or sitting upright. Despite his continued complaints and requests, he was denied access to a physician.

Defendant Hicks has produced no documentation of any evaluation or assessment she made on Plaintiff and admits that "if it's not documented, it didn't happen." (Filing No. 74-2, at CM/ECF p. 154). Nor has she produced documentation of even a single phone call or other communication showing that her assessment, diagnosis, and ongoing treatment of Plaintiff was at the direction of a licensed doctor or even a registered nurse.

Considered in the light most favorable to Plaintiff, and fully supported by the evidence and Nurse Hicks' own statements, a reasonable jury could conclude that Nurse Hicks inadequately responded to Plaintiff's continued complaints, perhaps because she acted beyond the scope of her medical education and LPN license when providing Plaintiff's diagnosis and treatment, and she failed to use appropriate judgment when administering safe nursing practices  The evidence

---

> **A.** Yes. So he had blood cultures showing the Staphylococcus aureus. And I think in this situation with the disc infection and the blood culture showing staph, I think there's, you know, virtual certainty that that's the cause of discitis.

(Filing No. 74-2, at CM/ECF p. 172).

supports a finding that as a LPN and trained medical professional, Nurse Hicks was aware of the serious risks associated with the symptoms Foell was exhibiting and was aware or clearly should have been aware of the serious underlying conditions that accompany infection and unexplained severe back pain—particularly when accompanied by her palpation of an unexplained and painful lump, and that she failed to actually examine and evaluate Plaintiff before prescribing medications. A reasonable jury could further find that by the time Foell was allowed to see Dr. Weaver's APRN, on the condition that he arrange his own transportation, his untreated staph infection had progressed to cause a life-threatening sepsis, T8-T9 diskitis with a large (8 x 6 x 5 cent.) phlegmon, and a Methicillin-susceptible Staphylococcus Aureus (MSSA) bacteremia, later resulting in an acute kidney injury due to the necessary heavy dosage of antibiotics.

Plaintiff has therefore submitted evidence to support both the objective seriousness caused by Nurse Hicks' treatment actions and omissions and the deleterious results of her delay in denying Foell's ability to be evaluated by a physician, and her reckless or intentional failure to address Plaintiff's medical needs. Defendant Hicks is therefore not entitled to qualified immunity as a matter of law on Plaintiff's claim of deliberate indifference to his serious medical needs in violation of the Eighth Amendment.

b.      Sheriff Kramer

The objective component of the "deliberate indifference" claim is applicable to all Defendants. Having clearly established that Foell suffered from a serious medical need, an untreated staph infection on his spine that "brew[ed]" for weeks before he was permitted to see a physician, the court moves to the subjective component as applied to Sheriff Kramer. (See, Filing No. 74-2, at CM/ECF p. 175).

'Supervisors are not liable for Eighth Amendment claims brought under section 1983 on a respondeat superior theory." Fruit v. Norris, 905 F.2d 1147, 1151 (8th Cir. 1990). Personal involvement of supervisory officials, like that of Sheriff Kramer, therefore constitutes the touchstone of their liability. In other words, "if the acts complained of were done at the direction or with the knowledge or consent of a defendant supervisor then the defendant supervisor can be held liable." See, Howard v. Adkinson, 887 F.2d 134, (8th Cir. 1989).

Defendant Kramer argues that because "Plaintiff was one of the 112 inmates at the Detention Center and he did not know anything about the Plaintiff's Condition," or "the specific circumstances that led to the Plaintiff needing a medical release on December 24, 2015," or "how Plaintiff was medically taken care of when he was in custody in November and December 2015," he was not "personally involved in causing the deprivation of a constitutional right" and is therefore shielded by qualified immunity. (Filing No. 65, at CM/ECF pp. 16–17) (quoting Tripleet v. Azordegan, 570 F.2d 819, 823 (8th Cir. 1978).

Based on the evidnce before the court, as a chief supervisory figure for Lincoln County, Sheriff Kramer created, presented, and approved a program which, by its very design, enabled an LPN to diagnose medical problems and render treatment without contacting a doctor, and to unilaterally decide when a doctor was needed. (See, Filing 74-2). The evidence indicates that Sheriff Kramer promoted and allowed the use of medical "protocols" that permitted an LPN to diagnose conditions and prescribe prescription medications with full knowledge that Dr. Deb Weaver would not physically see or evaluate the inmates absent "extreme circumstances." Although Sheriff Kramer personally designed the county's new medical program, and he hired an LPN to implement it, he admittedly

did not supervise Nurse Hicks or otherwise assure that she was not implementing his plan in a manner which provided medical care to detainees and inmates beyond the qualifications of Nurse Hicks' license.[6] A jury could therefore find that Sheriff Kramer's plan, his decision to hire an LPN to be onsite, and his lack of any supervision to make sure she was actually consulting with a doctor before rendering a diagnosis and prescribing medication thereby effectively denied Plaintiff's access to a competent medical evaluation under life-threatening circumstances.

---

[6] **Q**: And you understand what the limit of a licensed practical nurse's practice is?
**A**: Between the two of them, they would figure out what was beyond her means and what needed to be done with that—with that patient.
**Q**: Did you—do you know whether or not a licensed practical nurse can prescribe medicine?
**A**: Yes, I do.
**Q**: And—what's your understanding?
**A**: They need to have a doctor prescribe medicine. That's part of the reason we have a doctor in the loop.
**Q**: And do you understand that in order for a doctor to prescribe medicine, that doctor needs to see the patient?

. . .

**A**: I know that the doctor and the nurse know what—what is a proper procedure for medicating a patient.
**Q**: So you didn't do any independent research on your own to find out whether or not your plan would meet with the law.
**A**: I know my plan would meet with the law because I have a doctor and I have a nurse and they know how to prescribe medicine.
**Q**: So you did not do anything independently—other than knowing that you had a doctor who would tell your nurse if she had a question, you did no further research than that.
**A**: I knew I was properly staffed; yes, I did.
**Q**: And what did you do to insure that was accurate?
**A**: I hired a doctor and a nurse.

(Deposition of Sheriff Kramer, Filing No. 74-2, pp. 116-17).

Defendant Kramer is not entitled to qualified immunity as a matter of law on Foell's Eighth Amendment claim of deliberate indifference to his medical needs.

c.    John Does 1-10

Plaintiff alleges that John Does 1-10 (unnamed prison officials) are also liable for their deliberate indifference to Plaintiff's serious medical needs for their failure to make sure Foell received adequate medical care. (Filing No. 1, at CM/ECF pp. 10-11).

Defendants counter that their motion for summary judgment should be granted as to John Does 1-10. (Filing No. 65, at CM/ECF pp. 16–17.) Defendants argue that Plaintiff's Complaint was filed in March 2017, and Plaintiff has yet to establish who these individuals are and what they specifically did or failed to do. (Filing No. 65, at CM/ECF pp. 16–17). Additionally, Defendants allege that Plaintiff has offered no evidence the unidentified John Does 1-10 had actual or even constructive knowledge of the Plaintiff's medical needs or that those needs were not being met. (Id.) In the absence of such facts, Defendants argue the plaintiff cannot prove the John Doe defendants acted with deliberate indifference in violation of Plaintiff's constitutional rights. (Id.)

Plaintiff did not address Defendants' motion for summary judgment with respect to John Does 1-10 in his opposition briefing.

The court finds that Plaintiff has not alleged facts to establish John Does 1-10 violated any constitutional right. Although Plaintiff's complaint was filed more than two years ago, he has yet to name these Defendants or explain with specificity how they are responsible for Plaintiff's alleged lack of access to proper medical

care. Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009). Summary judgment will be granted in favor of John Does 1-10.

     d.     <u>Lincoln County</u>

*Policy or Custom.*

In Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978), the Supreme Court held:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible for under § 1983.

<u>Id.</u> at 694. Thus, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." <u>Id.</u> at 691. It follows that "[a] government entity may not be held liable under 42 U.S.C. § 1983 <u>unless</u> a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." Dougherty v. City of Covina, 654 F.3d 892, 900 (9th Cir. 2011)(emphasis supplied).

Plaintiff has alleged that various policies, practices, and customs of Lincoln County unconstitutionally infringed on his rights. (Filing No. 72, at CM/ECF p. 18). Plaintiff contends that as final policymaker for the Lincoln County, Sheriff Kramer signed off on policies that unlawfully permitted an LPN to practice medicine and prescribe medication to inmates based upon protocols that Dr. Deb. Weaver, as the county's medical director, approved. (Filing No. 73, at CM/ECF p. 18). Plaintiff further challenges LCDC's practice and custom of failing to maintain patient records, permitting a licensed nurse to serve as "gatekeeper" to an inmate's ability

to see a physician, and the practice of allowing inmates access to a physician only when they are so sick that they face possible hospitalization. (Filing No. 72, at CM/ECF p. 18). Finally, Plaintiff challenges the policy which allowed the county to medically discharge Foell while he was critically ill in the emergency room, thereby avoiding liability for his medical expenses. (Filing No. 72, at CM/ECF p. 18). Plaintiff argues that his Eighth Amendment rights were violated through execution of these official practices, customs, and policies of the County of Lincoln.

In support of his claim, Plaintiff points to Lincoln County's policies governing the medical treatment provided to pretrial detainees and inmates. Construing the facts and all justifiable inferences in Plaintiff's favor, a jury could find that Lincoln County's protocols[7] and practices[8] led to Foell's serious deprivation of medical care while incarcerated. See, Bd. Of County Comm'rs v. Brown, 520 U.S. 397, 404 (1997) (A plaintiff must demonstrate "a direct causal link between the municipal action and the deprivation of federal rights." For this reason, the county is not immune from suit.

*Failure to Train.*

"[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." City of Canton, Ohio v. Harris, 489 U.S. 378, 387 (1989). The issue, in such cases, will hinge on whether the "training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.'" Id. at 390.

---

[7] For example, protocols that permitted the unauthorized practice of medicine, dentistry, and for a nurse to prescribe or withdraw prescription medication.

[8] Such as, allowing a LPN full discretion in deciding which inmates are allowed to see a doctor.

> It may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

(Id. )

Plaintiff argues that Sheriff Kramer, as final policymaker for Lincoln County and commanding officer of Nurse Hicks and other prison officials, failed to train and supervise LCDC staff as to the medical care to which inmates were constitutionally entitled. (Id.) Lincoln County has not addressed Plaintiff's <u>Monell</u> claim as it relates to the county's failure to provide proper training.

Based on the evidence cited by Plaintiff, the court finds that Dr. Weaver developed "protocols" for Nurse Hicks to follow. There is no evidence regarding what training, if any, she received on implementing those protocols or protocol exceptions as appropriate. There is also no evidence of what the training should have been or how that training could have changed the outcome as to Plaintiff. So, even assuming Nurse Hicks was wholly untrained by Lincoln County, there is no evidence of any causal link between the alleged lack of training and Plaintiff's injuries and damages. Plantiff's claim based on failure to train must therefore be dismissed.

ii.    Negligence Claims.


a.    Immunity.


Plaintiff alleges he is entitled to recover against the defendants on common law negligence theories. As a political subdivision of Nebraska, Lincoln County is shielded by immunity from tort recovery unless it has expressly waived this immunity. See, e.g., Doe v. Bd. of Regents of Univ. Of Neb., 280 Neb. 492 (2010). As applicable to this case, any governmental immunity applicable to the County's immunity is set forth in the Political Subdivision Tort Claims Act ("PSTCA"), Neb. Rev. Stat § 13-910 (Cum. Supp. 2017).


The PSTCA includes limited waivers of immunity, subject to statutory exceptions. Kimmina v. City of Hastings, 291 Neb. 133, 141 (2015). It further provides that claims against a political subdivision employee for acts and omissions performed in the course and scope of employment are deemed actions against the county and not the employee personally. See Cappel v. State, 298 Neb. 445, 452 (2018).


Here, Plaintiff has alleged state negligence claims: (1) against Defendant Kramer for his failure to provide safe and timely medical care;[9] and (2) against Defendant Hicks for her breach of the applicable standard of nursing care. (Filing No. 1 ¶¶ 1–34; 49–55, at CM/ECF pp. 1–9, 13–14). The parties apparently agree

_____

[9] Plaintiff's original complaint also named the staff of LCDC, in their individual and official capacities. However, as Plaintiff has not addressed these Defendants in his opposition to Defendants' summary judgment motion, and has not pleaded with specificity any alleged wrongful acts or ommissions by the staff or its specific members, the court deems Defendants' summary judgment motion granted as to the detention center staff.

that as to the claims alleged, Kramer and Hicks were acting within the scope of his or her public employment. Lamb v. Fraternal Order of Police Lodge No. 36, 293 Neb. 138, 146 (2016). As such, the alleged negligence claims against Defendants Kramer and Hicks are actions against Lincoln County, and except as permitted under the statutory waiver set forth in Nebraska's PSTCA, Lincoln County is immune from liability for such claims.

The remaining question presented is whether, under the facts presented, the language of the PSTCA waives the County's immunity from suit on Plaintiff's common law negligence claims. The County does not dispute that Plaintiff complied with the procedural prerequisites of the PSTCA. But the parties disagree on whether the County retains immunity under the "discretionary function" exception of the PSTCA. Under that exception, the PSTCA does not waive the County's immunity as to "any claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of the political subdivision or an employee of the political subdivision, whether or not the discretion is abused." Nev. Rev. Stat. § 13-910(2). See also, Neb. Rev. Stat. § 81–8,219(1) (the State Tort Claims Act ("SCTA") containing similar language).

The purpose of discretionary function immunity "is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." A.B. v. Millard Public School Dist., 2009 WL 725974 * 3 (Dist. Neb. 2009). Discretionary function immunity extends to only basic policy decisions. It does not apply to discretionary acts performed at an operational level.

> Examples of discretionary functions include the initiation of programs and activities, establishment of plans and schedules, and judgmental decisions within a broad regulatory framework lacking specific

standards. The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy. The political subdivision remains liable for negligence of its employees at the operational level, where there is no room for policy judgment.

A.B. v. Millard Public School Dist., 2009 WL 725974 * 3 (Dist. Neb. 2009) (quoting Doe v. Omaha Public School Dist., 727 N.W. 2d 447, 456–57 (Neb. 2007).

As an initial matter, Plaintiff contends that Defendants cannot raise the discretionary function exemption because they failed to allege it in their answer or at any time prior to moving for summary judgment. (Filing No. 72, at CM/ECF p. 19). Prior to 2017, the discretionary function exemption was considered a defense which must be affirmatively pleaded. But Davis v. State, 297 Neb. 955, 961 (2017), reversed that holding, explaining:

> We overrule Nebraska cases holding that an exception to the State's waiver of immunity for tort claims under the STCA is an affirmative defense that the State must plead and prove. Because the exceptions are jurisdictional in nature, we hold that a court can consider an STCA exception sua sponte or on appeal.
>
> . . .
>
> [C]ourts have a duty to determine whether they have subject matter jurisdiction over a matter, treating the STCA exceptions as waivable affirmative defenses places courts in an impossible position when a jurisdictional problem appears on the face of a plaintiff's complaint.

Davis v. State, 297 Neb. 955, 961, 978 (2017). See also, Big Crow v. City of Rushville, 266 Neb. 750 (2003) ("[W]here language in the PSTCA is similar to language in the [SCTA], cases construing the one statute are applicable to construction of the other."). Applying the current Nebraska law as enunciated in Davis, the discretionary function exception to immunity is not an affirmative defense which is waived if not pleaded. Even absent any allegation raising the

discretionary function exception, the court must decide whether the exception is applicable to determine whether it has subject-matter jurisdiction to adjudicate Plaintiff's tort claims against the County.

Courts apply a two-step analysis to determine whether the discretionary function exception of the PSTCA affords immunity. Shipley v. Dept. of Roads, 283 Neb. 832, 840 (2012). The court must first determine whether the alleged negligent act or omission was a matter of choice for the acting employee. If the employee's conduct was specifically prescribed by statute, regulation, or policy such that the employee "has no rightful option but to adhere to the directive," the employee's conduct was not discretionary. Berkovitz v. United States, 486 U.S. 531, 536 (1988). But if the challenged conduct was performed based on an employee's judgment or choice, the discretionary function exemption may preserve a political subdivision's immunity from tort liability. Assuming the employee's challenged conduct was based on a judgment or choice, the court must then decide whether the discretionary function exception was designed to shield that conduct. (Id. at 840). The principal focus of this second part of the test is on "the nature of the actions taken and on whether they are susceptible to policy analysis." United States v. Gaubert, 499 U.S. 315, 325 (1991). Decisions regarding how to best use local and limited governmental resources are based on legislative judgments. The discretionary function exception was enacted to shield governmental entities from lawsuits challenging this type of decision or judgment. See, Kiehn v. United States, 984 F.2d 1100, 1107 (10th Cir. 1993); Fang v. United States, 140 F.3d 1238 (9th Cir. 1998). On the other hand, if the Plaintiff's claims do not challenge actions which are the product of competing policy-based judgments and decisions, the political subdivision cannot claim immunity based on the discretionary function exception. Political subdivisions are not entitled to the immunity preserved under the discretionary function exception, and remain liable for the negligence of their

employees at the operational level, if the employee decisions were not based on policy judgments.

Defendants contend that claims based on alleged negligence in instituting inmate medical care policies and in failing to develop adequate protocols for deciding when emergency care is required are discretionary functions. Defendants argue the discretionary function exemption affords them immunity, thereby protecting them from lawsuits like the Plaintiff's. ([Filing No. 65, at CM/ECF p. 27](#)). Plaintiff disagrees, arguing "[t]he discretionary function exception is not available to claims challenging the actual administration of medical care by governmental employees," noting Nurse Hicks herself denied having any policymaking authority. ([Filing No. 72, at CM/ECF p. 19](#)).

As applied to Plaintiff's claims, Sheriff Kramer's and Nurse Hicks' challenged conduct was fundamentally different and must be separately evaluated. Under the evidence presented, Sheriff Kramer's decisions regarding LCDC's program for medical services, related budgetary allocations, and the institution of protocols thereto were policy-based choices on how to properly allocate and use limited resources without the judicial branch second-guessing their legislative or administrative decisions. Sheriff Kramer's alleged conduct therefore involved the discretionary balancing of interests—the pros and cons of retaining a third party resource to provide detainee and inmate medical care compared to handling such responsibilities in-house by hiring a nurse, retaining a doctor, and implementing protocols and procedures to administer medical care. In this case, Sheriff Kramer's alleged negligence was proposing and implementing a cost-saving program for affording medical care which, in turn, resulted in inadequate care provided to Plaintiff. Sheriff Kramer's alleged negligent conduct was policy-based and

discretionary. The County is therefore immune from lawsuits challenging that conduct under the discretionary function exemption to the PSTCA.

But once the County's policy decisions, and the programs created based on those decisions, were implemented, "the policy shield of the discretionary function exception disappears." Fang, 140 F.3d 1238, 1242 (1998). Claims which challenge the actual administration of medical care based on the choices and decisions made by employees are not afforded immunity.[10] Fang, 140 F.3d at 1241–42. "[T]he need to protect the exercise of policy judgment from the spectre of tort liability does not mean that Congress intended a mere medical error or mistake to be similarly shielded." Id. at 1241.

Here, Nurse Hicks was hired to implement the County's program for inmate medical care, and she allegedly failed to appropriately assess and treat, and to properly refer Foell to a physician. Plaintiff's allegations against Defendant Hicks do not challenge policy-based decisions. Instead, Plaintiff alleges Hicks provided medical care below the standard owed to the Plaintiff.

For the foregoing reasons, the court finds that the discretionary function exception to the PSTCA's immunity waiver does not apply to Defendant Hicks. The PSTCA waives the County's immunity as to allegations that Hicks was negligent. But as to Defendant Kramer, the PSTCA's waiver of immunity is inapplicable; that is, the County has not waived its immunity and this court lacks subject matter

---

[10] Policy-based choices entail those legislative and administrative choices grounded in social, economic, and political strategy. McGauley v. Washington County, 297 Neb. 134, 139 (Neb. 2017).

jurisdiction to decide whether Sheriff Kramer's alleged conduct--all of which was policy-based—was negligent.[11]

b. <u>Proximate Cause</u>

Finally, Defendant argues that Plaintiff's third and fourth negligence claims must fail because there is no evidence the alleged negligence was a proximate cause of Plaintiff's injuries. As a preliminary matter, as to claims alleging Sheriff Kramer was negligent, the County is immune from suit. Therefore, the sole remaining question is whether there is a genuine issue of material fact as to Plaintiff's negligence claim against Nurse Hicks.

Applying federal procedural law to the pending summary judgment motion,[12] Foell bears the burden of presenting evidence to support each element of his prima facie case. Where medical malpractice is alleged, a plaintiff must show "(1) the applicable standard of care, (2) that the defendant(s) deviated from that standard of care, and (3) that this deviation was the proximate cause of the plaintiff's harm." Thone v. Regional West Medical Center, 275 Neb. 238, 242 (Neb. 2008). In response to Defendant's motion, Plaintiff must therefore present evidence that

---

[11] It is further noted, "where a plaintiff's tort claim is based on the mere fact of government employment (such as a respondeat superior claim) or on the employment relationship between the intentional tort-feasor and the government (such as a negligent supervision or negligent hiring claim), the intentional torts exception applies and the political subdivision is immune from suit." Britton v. City of Crawford, 282 Neb. 374, 386 (2011).

[12] Unlike Nebraska summary judgment practice, (see Kaiser v. Union Pac. R.R. Co., 927 N.W.2d 808, 816 (Neb. 2019)), a defendant moving for summary judgment in a federal case need only show that Plaintiff has no evidence to support an element of a claim for which Plaintiff bears the burden of proof. A defendant moving for summary judgment need not first present evidence refuting the elements of Plaintiff's claims. Celotex, 477 U.S. at 325.

Here, the procedural distinction is not outcome determinative. Applying either standard, Plaintiff has produced ample evidence to support his claim.

Nurse Hicks committed professional negligence when caring for and treating Foell and that such negligence was the proximate cause of Foell's harm. Id.

A defendant's negligence is not actionable unless it proximately causes the plaintiff's injuries or proximately contributed to them. Hamilton v. Bares, 267 Neb. 816, 678 N.W.2d 74 (2004). A proximate cause is that which produces a result in a natural and continuous sequence and without which the result would not have occurred. Radiology Servs. v. Hall, 279 Neb. 553, 780 N.W.2d 17 (2010). A defendant's conduct is a proximate cause of an event if the event would not have occurred but for that conduct, but it is not a proximate cause if the event would have occurred without that conduct. Worth v. Kolbeck, 273 Neb. 163, 728 N.W.2d 282 (2007).

Defendant argues Foell's negligence claim must fail as a matter of law because Defendants' expert, Dr. Eduardo Freitas, MD,[13] opines that Nurse Hicks provided nursing care consistent with the applicable professional standards, the cause and timeframe of the Plaintiff's infection cannot be determined, and Nurse Hicks' actions or inactions did not proximately contribute to Plaintiff's injuries. (Filing No. 66, at CM/ECF pp. 37–42). For these reasons, Defendant argues that Plaintiff will be unable to demonstrate proximate causation. (Filing No. 65, at CM/ECF pp. 32–33).

As a general matter, a plaintiff seeking recovery under medical malpractice law must present expert testimony to identify the applicable standard of care. See, Fossett v. Board of Regents, 258 Neb. 703 (2000). However, the Nebraska Supreme Court has "long recognized that a party can make a prima facie case of

---

[13] Board Certified in Infectious Diseases. (Filing No. 66, ¶ 1 at CM/ECF p. 37).

professional negligence even without expert testimony in cases where 'the evidence and the circumstances are such that the recognition of the alleged negligence may be presumed to be within the comprehension of laymen.'" Thone, 275 Neb. at 904 (quoting Halligan v. Cotton, 193 Neb. 331, 336 (1975).

Although Plaintiff has produced expert testimony of Foell's examining physician and Board-Certified Infectious Disease doctor, Jeffrey Sartin, M.D., [14] none of Dr. Sartin's deposition testimony addresses the applicable standard of professional nursing care for a licensed nurse. Nevertheless, the court finds based on the "evidence and circumstances" presented, that this case involves the type of "extreme and obvious misconduct" sufficient to trigger the "common-knowledge exception." Thone, 275 Neb. at 243–44. Under the common knowledge exception, "[n]o expert testimony is required in order to show that the failure to attend a patient altogether does not constitute reasonable care when common sense indicates that, without attention, the patient may suffer serious consequences." Id. at 244 (quoting 1 David W. Louisell & Harold Williams, Medical Malpractice § 8.05[4] at 8–81 (2007)).

Even if the precise date of the infection cannot be determined, a jury could find, based on common sense, that due to Nurse Hicks' consistent refusal to allow Plaintiff to be evaluated by a physician—even after she palpated the painful and unexplained lump on his back—Plaintiff endured (and fortunately survived) a fulminating infection, sepsis, and related pain. Dr. Sartin testified that Foell had an infection that had been "brewing" for several weeks, which he could ascertain with a reasonable degree of medical certainty was caused by Staphylococcus Aureus

---

[14] See Filing No. 74-2, at CM/ECF pp. 167-180. (Deposition of Jeffrey Sartin, M.D., taken before Morgan M. Catania, RPR, CSR(IA), General Notary Public within and for the State of Nebraska, beginning at 12:58 p.m., on April 5, 2018, at Infectious Diseases and Epidemiologist Associates, 17030 Lakeside Hills Plaza, Suite 202, Omaha, Nebraska).

based on Foell's blood cultures. ([Filing No. 74-2, at CM/ECF p. 172](#)). Dr. Sartin further testified that considering the extent of infection present, the Cephalexin and Clindamycin prescribed by Nurse Hicks would not fully treat Foell's staph infection. Dr. Deb Weaver indicated that had she been allowed to see Foell, she would have taken his vital signs, and possibly blood samples, in addition to testing his C-reactive protein.

Based upon the evidence of record, a jury could find that Nurse Hicks unlawfully prescribed antibiotics and controlled substance painkillers based on a differential diagnosis she was not qualified to make--whether due to the lack of adequate medical training or the lack of any actual evaluation of Plaintiff's complaints and medical condition. Proving a deviation from the standard of care can be "straightforward," requiring nothing more than "credible testimony from a lay witness." Thone, [275 Neb. at 907](#). Here, Dr. Sartin's testimony and Plaintiff's declaration show there is a genuine issue of material fact as to whether Nurse Hicks failed to exercise the standard of care owed by nursing professionals.[15] Plaintiff's failure to produce expert testimony on the applicable professional standard of care for nurses or on the issue of proximate cause does not support granting summary judgment in favor of Nurse Hicks.

---

[15] The court notes that Nurse Hicks could arguably be held to the standard of care owed by a physician since she performed the services of a physician--diagnosis and treatment requiring a medical degree—and allegedly did so without a doctor's supervision or case-specific direction.

Accordingly,

IT IS ORDERED:

1) Plaintiff's Motion to Strike Defendants' Expert Affidavits, Filing No. 69, is denied. Plaintiff is afforded until August 9, 2019 to depose Defendants' experts and if he chooses to do so, may disclose responsive experts on or before September 6, 2019.

2) Plaintiff's Motion to Strike the letter from Laura Kubitz, Filing No. 84, is granted.

3) Defendants' Motion for Summary Judgment, (Filing No. 64), is granted in part and denied in part as follows:

   a. Defendants' motion is granted in its entirety as to John Does 1-10, including but not necessarily limited to "the staff of LCDC, in their individual and official capacities."

   b. Defendants' motion is denied in its entirety as to Defendants Hicks and Kramer with respect to Plaintiff's 42 U.S.C. § 1983 claim for Cruel and Unusual Punishment under the Eighth Amendment.

   c. Defendants' motion is granted as to Plaintiff's "Failure to Train" claim and denied as to Plaintiff's "Policy or Custom" claim as to the County of Lincoln with respect to Plaintiff's 42 U.S.C. § 1983 claim for Cruel and Unusual Punishment under the Eighth Amendment.

   d. Defendants' motion is granted as to Plaintiff's state law claim for negligence against Sheriff Kramer; governmental immunity is afforded under the discretionary function exemption to the Political Subdivision Tort Claims Act. Neb. Rev. Stat. § § 13-901 et seq.

   e. Defendants' motion is denied as to Plaintiff's PSTCA claim for negligence against Defendant Hicks.

4) For good cause shown, Defendants' motion to continue the trial, ([Filing No. 93](#)), is granted. The parties' efforts toward settlement should continue, with Judge Bazis' assistance as needed. The parties shall contact my chambers on or before July 26, 2019 to re-schedule the trial and if necessary, Plaintiff's expert deposition deadline and expert disclosure deadline.

Dated this 9th day of July, 2019.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge